UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                               Case No. 20-CR-185

JULIAN SANCHEZ,
    a/k/a "Terps,"

        Defendant.

---

## PLEA AGREEMENT

---

1.     The United States of America, by its attorneys, Richard G. Frohling, Acting United States Attorney for the Eastern District of Wisconsin, and Gail J. Hoffman and Elizabeth M. Monfils, Assistant United States Attorneys, and the defendant, Julian Sanchez, individually and by attorney Dennis P. Coffey pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2.     The defendant has been charged in a two-count Information, which alleges violations of Title 21, United States Code, Sections 841(a)(1), (b)(1)(B) and 846; and Title 18, United States Code, Sections 924(c)(1)(A)(i) and 2. The defendant has also been charged in three courts of a fifteen-count Indictment, which alleges violations of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A), (b)(1)(B),

(b)(1)(C), and 846; and Title 18, United States Code, Sections 924(c)(1)(A)(i), 1956(h) and 2.

3.     The defendant has read and fully understands the charges contained in the Indictment and Information. He fully understands the nature and elements of the crimes with which he has been charged, and those charges and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4.     The defendant voluntarily agrees to waive prosecution by Indictment in open court.

5.     The defendant voluntarily agrees to plead guilty to the following counts set forth in full as follows:

<u>COUNT ONE</u>

**THE UNITED STATES ATTORNEY CHARGES THAT:**

1.     Beginning by at least January 2017, and continuing until on or about September 22, 2020, in the State and Eastern District of Wisconsin and elsewhere,

**JULIAN SANCHEZ,**
a/k/a "Terps,"

knowingly and intentionally conspired with each other, and with other persons known and unknown to the grand jury, to possess with the intent to distribute and to distribute a mixture and substance containing a detectable amount of a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

2.     With respect to the defendant, the amount involved in the conspiracy attributable to the defendant as a result of his own conduct, and the conduct of other co-conspirators reasonably foreseeable to him, is 100 kilograms or more of a

2

mixture and substance containing a detectable amount of marijuana, a Schedule I controlled substance.

All in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(B), and Title 18, United States Code, Section 2.

## COUNT TWO

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

On or about September 22, 2020, in the State and Eastern District of Wisconsin and elsewhere,

**JULIAN SANCHEZ,**
**a/k/a "Terps,"**

knowingly possessed two firearms in furtherance of the drug trafficking offense charged in Count One of the Information, to wit:

1.    a Polymer80 pistol, bearing no serial number; and

2.    a Smith and Wesson, model M&P, .40 caliber pistol, bearing serial number HLX3296.

All in violation of Title 18, United States Code, Section 924(c)(1)(A)(i).

6.    The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offenses described in paragraph 5. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the following facts beyond a reasonable doubt. The defendant admits that these facts are true and correct and establish his guilt beyond a reasonable doubt:

### Summary of Investigation

In September 2018, law enforcement authorities identified Louis R. Perez III (a/k/a "Ocho," and a/k/a "Eight Ball"), also identified as a Mexican Posse gang member, as the individual spearheading a drug-trafficking organization (DTO) that

3

was distributing large quantities of cocaine and marijuana throughout Milwaukee, Wisconsin, and elsewhere since at least January 2017. Law enforcement authorities also identified Xina Yang, Perez III's then girlfriend, as someone who worked hand-in-hand with Perez III to further the DTO. The DTO obtained cocaine and marijuana from California, either through couriers or through United Parcel Service (UPS) and FedEx. Perez III and Yang coordinated the package retrieval from various Milwaukee, Wisconsin, residences, oversaw a marijuana vape cartridge manufacturing operation located at a codefendant's residence, distributed marijuana and marijuana-related products under the name brand "Midwest Connect" or "Midwest Connected," and mailed drug proceeds to the California-based supplier.

Upon further investigation, authorities learned that, beginning in at least January of 2017, Julian Sanchez and/or Miguel Sarabia, Sanchez's father, who resided in California, supplied the Perez III DTO with bulk marijuana, marijuana edibles, marijuana oils/waxes, and marijuana vape cartridges.

During the course of the investigation, Title III orders authorized the interception of communications over seven telephones used by Perez III, Yang, Sanchez, and Sarabia, as well as the Snapchat account "Midwest_connect," used by Perez III. Collectively, these interceptions began on March 20, 2020, and continued through September 22, 2020, with the exception of small periods of time. The intercepted communications confirmed that Perez III obtained marijuana from Sanchez and Sarabia, that Perez III distributed the narcotics to mid-level distributors and suspected street-level users, and that Yang facilitated and coordinated the day-to-day DTO operations.

### DTO's History, Method, and Operation

The investigation revealed that up until late 2019, Perez III and Yang frequently traveled to California on behalf of the DTO, many times staying for significant periods of time in hotels and Airbnb rentals. At this time, Perez III and Yang instructed other DTO members to manage the distribution of controlled substances in Milwaukee when they were in California.

On September 25, 2018, Louis R. Perez Jr., Perez III's father, was stopped in Utah with eight kilograms of cocaine in a trap compartment in his truck. Perez III and Yang drove separately, but traveled along with Perez Jr. from California to Wisconsin, communicating with Perez Jr. on two prepaid telephones activated before their departure from California. After Perez Jr. was stopped, Perez III and Yang also stopped, at which point Yang booked hotel rooms and airfare for herself, Perez III, and Perez Jr. upon his release from custody.

Beginning in November 2019, Perez III and Yang moved back to Milwaukee. At this time, the DTO's mode of operation switched to mailing controlled substances

4

and proceeds between California and Milwaukee. Also at this time, Sanchez obtained hundreds of pounds of marijuana from growers in northern California. Sanchez, along with Gabriel Matteson, packaged and sent the marijuana through FedEx and UPS to numerous addresses in Milwaukee, Wisconsin. Perez III and Yang regularly tracked the controlled substance packages' whereabouts. They also coordinated the package retrieval from various Milwaukee residences.

Court authorized interceptions, combined with physical surveillance, reflect that the Perez III DTO received at least 200 packages, believed to contain marijuana and THC oil, which have been delivered by FedEx and UPS, to at least eight different addresses. DTO package recipients included Jose Alvarado, Shayla Knueppel, Mercedes Herbert Gonzalez, Chong Yang, Mary Yang, Ma Yang, and Michael Bub.

On April 29, 2020, law enforcement seized and lawfully searched a DTO package. The package contained approximately 9 pounds of high-grade marijuana and approximately 237 grams of THC oil, which oil was packaged in one-gram quantity plastic containers. Both the THC oil and marijuana were packaged in vacuum sealed bags. Later in the day on April 29, 2020, in accordance with UPS policy, UPS opened another package addressed to Alvarado and Knueppel's address because it smelled of marijuana. The package was found to contain approximately 2,029 grams of THC oil, which was packaged in one-gram quantity plastic containers. Throughout April 29 and 30, 2020, both Perez III and Yang contacted FedEx and UPS numerous times regarding the intercepted packages.

Perez III used couriers, including Manuel Soto, Antonio Rodriguez, Hauseng Yang, and Esteban Reyes, to obtain the packages containing controlled substances from various addresses and transport the packages to other DTO locations, including Perez Jr.'s residence, where the packages were stored until manufacture, packaging, and distribution. Hector Arenas maintained at least two stash houses where Perez III and various other DTO members were often seen coming and going around the time of suspected drug transactions. Jasmine Perez, Perez III's sister, served as a DTO nominee, leasing one of the stash apartments that was controlled by Manual Soto.

Additionally, the Perez III DTO manufactured "vape cartridges" containing THC oil at the residence of Mary Yang, Yang's sister. Under the direction of Perez III and Yang, marijuana vape cartridges were assembled by the thousands by DTO members primarily connected to Xina Yang, including Ma Yang, Mary Yang, Chong Yang, Azia Yang, Carina Rodriguez, Ger Yang, Hauseng Yang, and Michael Bub. The investigation also revealed that Sanchez and/or Sarabia also imported supplies, to include vape cartridge tubes and boxes, as confirmed by the seizure and search of five DHL packages, which contained high-end, top rated CUREpen and Rove vape cartridge boxes.

5

Case agents estimate based on the number of DHL boxes received by the Perez III DTO that the DTO received at least 25,000 vape cartridge boxes and empty marijuana vape pens that were imported from Hong Kong.

Perez III distributed the cocaine, marijuana, and marijuana-related products to mid-level DTO-distributors, including Manuel Soto, Antonio Rodriguez, Hauseng Yang, Hector Arenas, Luis Gomez, Jr., Ivan Galan, Esteban Reyes, Kevin Taylor, and Ger Yang. These mid-level distributors subsequently distributed the controlled substances to numerous customers in the greater Milwaukee, Wisconsin, area, at times using the third-party application Snapchat. The marijuana and marijuana-related products were distributed under the brand name "Midwest Connect" or "Midwest Connected."

Subsequently, the DTO mailed packages containing bulk currency in the form of drug proceeds to Sanchez or enlisted money couriers to transport the drug proceeds to California. Furthermore, on various occasions in 2020, Sarabia traveled to Milwaukee, Wisconsin, to obtain drug proceeds from Perez III.

Yang counted and packaged the drug proceeds that were sent to Sanchez via the United States Postal Service (USPS) at three different addresses. Ma Yang, Yang's sister, often assisted. On April 16, 2020, law enforcement searched two parcels that Perez III mailed to Sanchez, pursuant to sneak and peak warrants. The search revealed that each parcel contained $20,000 in U.S. currency hidden in magazines. The money was meticulously taped between the various magazine pages to conceal the parcels' true contents.

Although Perez III and/or Yang used aliases and unrelated addresses to ship the packages, post office video surveillance, court-ordered location data from tracking devices on their vehicles and telephones, and court-authorized intercepted communications confirmed their association with the packages.

Since at least December 11, 2019, Perez III and Yang mailed at least 87 packages, believed to contain bulk U.S. currency, to Sanchez in California, using the United States Postal Service (USPS). Based upon DTO records, the DTO mailed approximately $1.7 million in drug proceeds in a six-month period. In July 2020, Perez III mailed three USPS parcels containing a total of $60,000 to Sanchez. All three parcels were believed to be stolen, prompting the DTO to stop mailing drug proceeds, and instead use couriers to deliver bulk currency to Sanchez.

### Defendant – Julian Sanchez

Julian Sanchez (a/k/a "Terps") resided at 34xx Avenue of the Arts, Apt. A4xx, Costa Mesa, California. Sanchez is the son of codefendant Miguel Sarabia. The investigation has revealed that Sanchez supplied the Perez III drug trafficking organization (DTO) with bulk marijuana, marijuana edibles, marijuana oils/waxes,

6

marijuana vape cartridges, and/or other controlled substances, which were then sold in Milwaukee, Wisconsin, under the brand name "Midwest Connect" or "Midwest Connected." During the course of this investigation, case agents determined that Sanchez has used several cellular telephones, including (707) 888-xxxx and (213) 700-xxxx (Target Telephone 5), (562) 380-xxxx (Target Telephone 6), (562) 306-xxxx (Target Telephone 8), as well as Snapchat account "officialdjhaze" and Instagram account "lowkeyyterpss" to further the activities of the DTO.

For example, on April 7, 2020, at 2:37 p.m., Perez III, using Target Telephone 1, made an outgoing call to Julian Sanchez at (707) 888-xxxx. During this call, Perez III and Sanchez discussed Perez III using Perez III or Jasmine's financial information to assist Sanchez in the rental of a residence. Sanchez talked about downloading the application on their cellular telephones. At one point Sanchez stated, "That's all good. What I'm gonna do is, mmm, I'm 'bout to drop these boxes and I'm gonna go [U/I] and shit." Perez III replied, "Alright." Later in the conversation, Sanchez stated, "Hey, send me the address too 'cause Imma bout to drop these off." Perez III responded, "Alright, I got you bro."

Based upon their training, experience, and familiarity with the investigation, case agents believe that Sanchez was looking for a new residence to rent and that Sanchez did not have the credit needed to obtain the rental property. Sanchez asked Perez III to assist Sanchez with the financial information so that Sanchez could obtain the property. Further, during this call, Sanchez and Perez III discussed the shipment of a package to Perez III, and Sanchez told Perez III to send the address where the package should be shipped.

On April 17, 2020, at 12:02 p.m., Perez III, using Target Telephone 1, received an incoming call from Sanchez using Target Telephone 5. During this call, Sanchez is heard answering another telephone talking to someone else. Towards the end of the conversation Sanchez stated, "I gotta ship all this shit out so I can make money and pay my fucking monthly bills, too." Perez III stated, "Hey, call me back, yeah?" Sanchez replied, "Yeah, I'll call you."

Based upon their training, experience, and familiarity with this investigation, case agents believe that Sanchez told Perez III that Sanchez had to mail packages containing controlled substances to Perez III to keep the drug proceeds flowing and to pay his bills. ("I gotta ship all this shit out so I can make money and pay my fucking monthly bills too."). Case agents further believe that Perez III did not want to talk about the packages at that time, and thus interrupted Sanchez and asked Sanchez to call Perez III back. ("Hey, call me back, yeah?"). Sanchez agreed. ("Yeah, I'll call you.").

On April 18, 2020, at 5:55 p.m., Perez III, using Target Telephone 1, called Sanchez, using Target Telephone 5. Sanchez asked, "Hey, what was it two twenty

(220)? Or what?" Perez III replied, "Yeah I think so, two twenty (220)." Sanchez stated, "Alright."

Based upon their training, experience, and familiarity with this investigation, case agents believe that this call is in reference to the two United States Postal Service (USPS) parcels Perez III sent to Sanchez on April 15, 2020. A search of those USPS parcels revealed that each one contained $20,000 in U.S. currency. Therefore, case agents believe that Sanchez asked Perez III how many packages were sent and how much was in each package. ("Hey, what was it two twenty (220)? Or what?"). Case agents further believe that Perez III confirmed the contents of the two packages he sent to Sanchez, ("Yeah I think so, two twenty (220).").

On May 16, 2020, at 9:43 p.m., Sanchez received an incoming call on Target Telephone 5, from Miguel Sarabia, his father, using (949) 534-xxxx, Target Telephone 7. This call lasted approximately 37 minutes. During this call, Sanchez and Sarabia discussed numerous topics, including Sanchez's Airbnb account. Case agents know, from intercepted calls over Target Telephones 1 and 5, that at the time of this call, Sanchez had rented an Airbnb in northern California and was awaiting large quantities of marijuana. During the conversation Sarabia stated, "I still don't know if it was tracking still for his-his shipment." Sanchez replied, "Oh that's good." Sarabia stated, "The-the carts. The other ones I'm not gonna send it to him yet though. 'Til they [U/I]." Sanchez replied, "Man. He'll pay you or I have a [U/I] I don't [U/I] either one." Sarabia stated, "Our shit's almost ready." Sanchez asked, "Oh yeah?" Sarabia responded, "Besides the other one's I'm missing for…" Sanchez replied, "It's coming together man." Sarabia answered, "Yup." Case agents believe that during this call, Sarabia and Sanchez discussed the shipments of controlled substance packaging regarding the empty vape cartridges and vape boxes shipped to Milwaukee, Wisconsin, from Hong Kong. Case agents further believe Sanchez referred to Perez III and the money Perez III owes Sarabia when Sanchez stated, "Man. He'll pay you…"

Later in the conversation Sanchez continued, "Yeah, I think that shit is super fucked up nigga. I was like bro, what's up? He started talking to his homies and shit. I think he said this Monday or next Monday everything at 100%. It'll ready two-hundred so I'm driving two-hundred, dropping the bitches and that's it. I'm going the fuck home and then talk to JC hopefully fix that and get-get the ball rolling on this. On the inside 'cause it dry as fuck up here, man. It be dry for like a month or two and then come back up here for a four box order—from there four to two we go down to L.A. do two, three boxes and then that's when it's going to ramp up again." Sanchez replied, "When's he gonna kick off his carts? Is he already making 'em?" Sanchez replied, "Oh. He's already doin it. I know because they were dry on carts and now there's carts plus posting up. All [U/I] carts here there so." Sarabia asked, "What carts he posting up?" Sanchez replied, Mmm. Right now, V-V-S's. Yeah, nothing just [U/I] V-V-S's and uh, the West Coast Cures."

8

Based upon their training, experience, and familiarity with the investigation, case agents believe this conversation pertained to Sanchez's plans to obtain 200 pounds of marijuana for Perez III and ship it to Milwaukee. ("I'm driving two-hundred, dropping the bitches and that's it"). Case agents know that a "box" is a common term used to describe one hundred pounds of marijuana. Further, case agents believe that Sarabia inquired when Perez III was manufacturing the cartridges containing THC oil, ("When's he gonna kick off his carts? Is he already making 'em?"), and Sanchez told Sarabia that Perez III was already making them, ("Oh. He's already doin' it.").

The conversation continued, and Sarabia stated, "I lost my ass [U/I] one of his carts." Sanchez replied, "Uncle [CHUCKLES] uncle is funny." Sarabia stated, "Yeah, "I'll go half with you,'" I said. "'Half.'" I said "'you-you rather go half then buy some stupid expensive.'" Sanchez asked, "He still got 'em for eight bucks?" Sarabia asked, "He-he-Goofy (Sarabia's brother; Sanchez's uncle) get 'em for eight bucks?" Sanchez replied, "Yeah, I said he coulda go 'em for eight bucks through that one plug. I'm not fucking with that white dude no more, but I can still get the plugs from that." Sarabia asked, "Well... How much you get from her?" Sanchez replied, "Hmm? That fucker was acting weird I had to drop her but I still just get the... um..." Sarabia stated, "Honestly... Goofy's [U/I]." Sanchez stated, "[U/I] go get that cart. No. But he wants them for free I already know." Sarabia responded, "They cost me five bucks." Case agents believe that during this conversation, Sarabia and Sanchez discussed the prices they sell marijuana filled vape cartridges. ("He still got 'em for 8 bucks?" "They cost me 5 bucks"). Based upon their training, experience, and familiarity with the investigation, case agents believe that in this conversation Sanchez and Sarabia discussed Goofy's sale of vape cartridges on behalf of Sanchez and Sarabia.

On June 24, 2020, at 7:36 p.m., Sanchez, using Target Telephone 5, received a call from an unidentified male, using (831) 750-xxxx (UM7120). Sanchez stated, "What up? I had to tell you. Cancel that trip 'cause I'm fucking stuck up here." UM7120 asked, "What do you mean?" Sanchez replied, "Fucking, I told my guy I would stay up here and dry up all the OGs. So, they're holding me to me to my fucking word. So, I think." Case agents are aware that OG is a slang term for marijuana and that Sanchez needed to stay in northern California to obtain the marijuana that Sanchez promised to purchase for Perez III ("my guy."). UM7120 asked, "How many more you gotta get?" Sanchez replied, "Uh, fuck. I'm almost done clearing them out. I got like three more weeks. That's only two, three more boxes. He held me to my word. Man, you fucking dick. He's like bro, you know. So, you told me bro you were [U/I] until the O's were done. I was like damn." UM7120 laughed and Sanchez continued, "This nigga. And bro I'm just trynna make your pockets fatter, bro. Blah, blah, blah, blah. Man, shut up nigga I wanna go home. . . . [U/I] wanna keep going [U/I] ragging bull bro. I told him right after these OG's bro don't talk to me about no 'come take a run' 'cause it's already July. I don't wanna hear nothing." As stated above, case agents know that the term "box" is a

9

common term used in reference to a 100 pound quantity of marijuana. Further, case agents believe that Sanchez talked about Perez III requiring Sanchez stay in northern California to obtain the additional 200-300 pounds of marijuana ("That's only two, three more boxes"), but that Sanchez wanted to go back home to Los Angeles.

On July 10, 2020, at 7:38 p.m., Sanchez, using Target Telephone 5, called (909) 761-3174, used by Jared, a relative of Sanchez's. Sanchez inquired about Jared's immediate activities. Jared replied, "Inside grandma's house right now." Sanchez stated, "I see you. I'm on the block nigga searching for a sixty (60) K right now, nigga. Imma bout beat the fuck out of the post office man. I'm waiting for him right now." Jared replied, "Oh, yeah? Bro, you don't come till seven (7) o'clock." Sanchez stated, "Nah, bro. They said they delivered my boxes, that's what I'm saying bro." Jared replied, "Yeah, I'm trynna tell grandma, recover the [U/I] with me right now." Sanchez stated, "No, I know. I seen the recording. That guy never came." Case agents know that in early July 2020, Perez III mailed three packages believed to contain $20,000 in U.S. currency in each package (total of $60,000) from Milwaukee to Sanchez via the USPS to Sanchez's grandmother's residence, located at 32xx E. Valley View Avenue, West Covina, California. Case agents believe that Sanchez tracked the packages through the USPS website and discovered that the packages containing the currency showed that the packages were delivered, but that Sanchez never received the boxes at that address.

Sanchez continued, "Bro, this nigga right here, bro. He scanned my shit and said that he deliver my shit, bro. And when I called the P.O. office, the post office, they are telling me that this foo delivered it at the wrong house, bro." Jared replied, "Yeah. He did that. We got the neighbor's mail foo." Case agents believe that Sanchez and Jared discussed the delivery of the mail to the Valley View address and that the mail delivery person had scanned the packages as delivered, but that the Post Office told Sanchez that the packages had been delivered to the wrong address.

Sanchez stated, "Nigga, Imma bout to beat the fuck out this foo. Bro, trust, when I see this nigga he's gonna be on [U/I] bro." Jared replied, "Yeah. Yeah, I'm supposed to wait – I'm waiting for my check too, man." Sanchez stated, "I'm right here, nigga. I'm outside. I see your car and everything, nigga." Jared replied, "Oh yeah? I gotta go [U/I]." Sanchez stated, "Let's go. Come outside." Jared replied, "Alright." Case agents believe that Sanchez was in the area of the Valley View address, and that Sanchez wanted Jared to come outside and assist Sanchez with locating the missing packages containing cash.

On July 5, 2020, at 10:09 p.m., Sanchez, using Target Telephone 6, received a call from Jesus, Sanchez's uncle (a/k/a "Goofy"), and Sarabia's brother, using (562) 284-xxxx. During the call, Sanchez and Jesus discussed how the prices of marijuana had increased and that the market is good. Sanchez and Jesus

10

discussed codefendant Gabriel Matteson [Jesus' son] and his readiness to participate in the drug trafficking business. Sanchez stated that Matteson had "drive" but he's not "ready," meaning ready to be fully involved in drug trafficking activities. Sanchez stated that Matteson and Sanchez had developed a closer relationship as a result of their joint involvement in the marijuana business. The two also discussed Miguel Sarabia and Sanchez's relationship with Sarabia.

Sanchez stated, "Uncle, what hurts the most -- uncle, what hurts the most, Imma be real with you, uncle, what hurts me the most is I brought him into my line and he's helping out my line. He ain't not gonna give me money in my line, uncle. I know what's up with this nigga. He's already sending liters and edibles to my line and not tell me 'bout it? But hey uncle, I don't give a fuck. That five thousand dollars ($5,000), that's just little money to me. I touch real money, uncle. I don't give a fuck about that shit, real talk. That nigga can wash that shit and wipe his ass. I don't give a fuck, straight up." Case agents believe that Sanchez referred to Sanchez bringing Sarabia into the Perez III DTO ("my line") and that Sarabia sent "liters" of marijuana wax and marijuana edibles to Perez III without either informing Sanchez or cutting him in on the profits. ("Sending liters and edibles to my line and not tell me bout it?"). In addition, case agents believe that Sarabia launders drug proceeds. ("That nigga can wash that shit.").

### Search of Sanchez's Instagram Account

In addition, on May 4, 2020, a federal search warrant was executed on Instagram account "lowkeyyterpss," used by Sanchez. Sanchez's Instagram account contained numerous photographs and videos depicting marijuana and THC oil, indicative of marijuana and THC oil trafficking, numerous photographs and videos of Sanchez holding large amounts of U.S. currency, photographs of a money counter displaying the amount on the counter as $80,000, as well as photographs of USPS boxes case agents recognized as being shipped from Perez III (the shipping label reflected the package was shipped from "Melany Gonzalez" and addressed to Julian Sanchez). Also included within Sanchez's Instagram account was a photograph of a cellular telephone depicting a screen shot of a FedEx tracking site dated April 29, 2020, which indicated that a package was seized by police in Milwaukee, Wisconsin. The caption on the screen shot stated, "Give you a lil idea why I ain't been on my phones why I ben acting funny or anything I got a lot on my plate right now." Case agents believe that this screen shot referred to the packages seized by case agents on April 29, 2020, and that Sanchez and/or Perez III were nervous that the police had intercepted the package containing controlled substances.

Further, there were several hundred videos contained in Sanchez's account. At least 19 videos depicted large amounts of cocaine, which case agents believe is indicative of cocaine sales. In addition, there were at least 24 videos depicting guns, including guns containing extended magazines for the pistols. Due to the manner in which Instagram provided the data, case agents were unable to determine the

11

exact date the videos were posted. However, based upon the provided login information, Sanchez was actively using this account as of the warrant return date, May 20, 2020.

A string of messages between Sanchez and another unknown Instagram user revealed multiple messages regarding the prices of marijuana-related products and drug proceeds. For example, on December 29, 2019, Sanchez sent a message that stated, "Feel me gt more coming too no cap light 160k weekly." Case agents believe that Sanchez referred to Perez III's regular shipment of bulk U.S. currency to Sanchez to purchase marijuana and marijuana-related products ("gt (got) more coming" and "light 160k weekly."). On January 13, 2020, Sanchez sent an Instagram message to this unknown user that stated, "707888xxxx trap line 562380xxxx." Case agents believe that Sanchez provided the unknown user with both of Sanchez's telephone numbers ("707888xxxx," a predecessor phone number for Target Telephone 5, and "562380xxxx," Target Telephone 6). Case agents further believe that Sanchez identified Target Telephone 6 as Sanchez "drug phone" ("trap line 562380xxxx").

On March 12, 2020, Sanchez sent an Instagram message to an unknown user that stated, "Ima give you my throw away too let's not lose contact lol 5623809506." Case agents know that this number is Target Telephone 6. An analysis of the conversations between Sanchez and the unknown user of the account revealed numerous conversations about obtaining hundreds of pounds of marijuana, prices for the marijuana, and growing marijuana in northern California.

### Sanchez's Milwaukee Bank Account Information

On October 26, 2018, Sanchez opened US Bank account (x122). An analysis of the account showed that the account maintained $56,680 in cash deposits occurring from October 30, 2018, to February 1, 2019. All of the cash deposits, except for an initial $100 cash deposit when the account was opened, were conducted in or around Milwaukee, Wisconsin. The deposits also appeared to be structured in a manner to avoid the filing of a Currency Transaction Report (CTR), which is required to be completed by a financial institution anytime U.S. currency totals more than $10,000 in a single deposit. On October 30, 2018, at 11:47 a.m., Sanchez deposited $9,900.00 cash at a US Bank branch on Mitchell Street in Milwaukee, Wisconsin. At 12:16 p.m. the same day, a second cash deposit of $5,010.00 occurred into the same account but the cash was deposited at a US Bank branch on Greenfield Avenue in Milwaukee, Wisconsin. This also occurred on February 1, 2019, when Sanchez conducted three cash deposits of $9,900.00, $9,920.00 and $9,950.00 at different times and branches in Milwaukee, Wisconsin.

Based upon case agents' review of the account, the deposited cash was typically withdrawn in cash from the account within five to six days of the deposit.

In total, $56,515 cash was withdrawn from the account. Case agents know that at the time of Sanchez's arrest in September 2020, the account was closed.

## Search of Sanchez's Apartment

On September 22, 2020, pursuant to a federal search warrant issued by a Central District of California magistrate judge for Sanchez's residence at 34xx Avenue of the Arts, Apt. #4xx, Costa Mesa, California, authorities located two firearms – one of which was reported stolen from Milwaukee, Wisconsin, and the other of which is considered a "ghost" firearm (i.e., no discernible serial number), and multiple calibers of ammunition. In addition, authorities located a Cummins Allison money counter and a money tape machine, indicative of Sanchez's management of large sums of cash. Specifically, in the master bedroom safe authorities located the following: a Polymer80 Pistol (Ghost gun); a 31 round magazine inserted into the Polymer 80 Pistol containing 11 rounds of 9mm ammunition; a S&W MP, 40 caliber firearm which had previously been reported stolen in Milwaukee, Wisconsin; a magazine inserted into the S&W firearm containing 15 rounds; a 15 round magazine; and 14 rounds of .380 caliber ammunition. From the master bedroom closet shelf authorities recovered in close proximity to the safe the Cummins Allison money counter and money tape machine. Finally, authorities also recovered from an upstairs loft area a large trash bag containing a green leafy substance consistent with marijuana.

## Confidential Source Information

A source of information (SOI #3) related that in August 2020, Perez III asked SOI #3 to take money out to California for him. Perez III wanted SOI #3, to meet his marijuana and marijuana related products supplier, "Terps." SOI #3 subsequently identified a photograph of Julian Sanchez as "Terps." Prior to leaving for California from Perez III's residence, SOI #3 gave Perez III SOI #3's suitcase who took it upstairs to codefendant Xina Yang. Xina Yang packed the suitcase with money and Perez III also gave SOI #3 an additional $10,000 in U.S. currency for SOI #3's carryon bag.

SOI #3 flew from Milwaukee to San Francisco. Sanchez picked up SOI #3 from the airport. SOI #3 observed that codefendant Luis Gomez Jr. was in the passenger seat of Sanchez's vehicle. SOI #3 learned that Gomez Jr. and his girlfriend had taken a separate flight to San Francisco, also bringing an unknown quantity of money out to California for Perez III. Once at the hotel, Sanchez and Gomez Jr. unloaded the suitcase. Sanchez called Perez III who said the money was "short." Based upon an overheard conversation SOI #3 believed that the cash was $28,000. Perez III paid SOI #3 $400 for making the trip; however, SOI #3 was supposed to receive $800. SOI #3 stated that SOI #3 never received the additional $400 from Perez III.

In sum, SOI #3 knew that Sanchez supplied Perez III with marijuana and marijuana products. SOI #3 also knew that Sanchez was responsible for packaging the marijuana products for shipping as well as shipping the packages to Milwaukee for distribution by Perez III. While in California, SOI #3 was also at Sanchez's residence and Sanchez brought a handgun into the kitchen to show SOI #3.

Additionally, SOI #4 provided information about Julian Sanchez. SOI #4 stated that in October 2019 SOI #4 flew from Chicago to San Francisco. Prior to departing, codefendant Jasmine Perez provided SOI #4 with a large amount of U.S. currency. After meeting with Jasmine Perez, codefendant Xina Yang and SOI #4 communicated by facetime, and Xina Yang instructed how SOI #4 should pack the money in SOI #4's suitcase. According to Xina Yang's instructions, SOI #4 packed the suitcase full of money and checked the bag at the airport.

After landing, SOI #4 met Xina Yang and Perez III at an Airbnb. "Terps," identified by photograph as Julian Sanchez, was also at the residence. Xina Yang immediately unpacked the suitcase. Shortly after SOI #4 arrived at the Airbnb, "Terps" left.

SOI #4 made another trip to California in September 2020. Xina Yang told SOI #4 that SOI #4 would make $1,500 for driving money from Milwaukee to California. Xina Yang packed up the cash and SOI #4 rented a van in SOI #4's name; however, Xina Yang paid for the rental of the van. Xina Yang instructed SOI #4 to drive to a hotel in California where SOI #4 met Sanchez and delivered the money.

Based upon the evidence of supplying the conspiracy with 250 pounds of marijuana a month for twenty-four months, Julian Sanchez is responsible for the distribution of at least 1,000 kilograms, but less than 3,000 kilograms of a mixture and substance containing marijuana.

This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, these offenses.

## PENALTIES

7. The parties understand and agree that the offenses to which the defendant will enter a plea of guilty carry the following maximum terms of imprisonment, fine, and supervised release:

14

COUNT ONE: 40 years and a $5,000,000 fine. This Count also carries a mandatory minimum of 5 years of imprisonment, and at least 4 years and a maximum life term of supervised release.

COUNT TWO: a mandatory minimum of 5 years and a maximum life term of imprisonment, consecutive to Count One, a $250,000 fine, and a maximum of 5 years supervised release.

Each count also carries a mandatory special assessment of $100.

8.     The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

## PROOF OF DRUG WEIGHT FOR STATUTORY MAXIMUM PENALTY

9.     The parties understand and agree that for the penalties in 21 U.S.C. §841(b)(1)(B) to apply, as provided in paragraph 7 above, the government must prove beyond a reasonable doubt that the offense to which the defendant is pleading guilty involved at least 100 kilograms of marijuana. The defendant agrees that the government possesses sufficient, admissible evidence to meet this burden.

## DISMISSAL OF INDICTMENT

10.     The government agrees to move to dismiss the Indictment as to Julian Sanchez at the time of sentencing

## ELEMENTS

11.     The parties understand and agree that in order to sustain the charge of conspiracy to possess with the intent to distribute or to distribute a controlled substance as set forth in the Information, in violation of 21 U.S.C. §§ 841(a)(1) and 846, the government must prove each of the following propositions beyond a reasonable doubt:

15

<u>First</u>, the conspiracy, as alleged in the Information, existed; and

<u>Second</u>, the defendant knowingly and intentionally joined the conspiracy with the intention to further the conspiracy.

12.     The parties understand and agree that in order to sustain the charge of possessing a firearm during and in relation to a drug trafficking crime as set forth in the Information in violation of 18 U.S.C. § 924(c), the government must prove each of the following propositions beyond a reasonable doubt:

<u>First</u>, the defendant committed the crime of conspiracy to distribute and possess with intent to distribute a controlled substance as charged in the Information;

<u>Second</u>, the defendant knowingly possessed a firearm; and

<u>Third</u>, the defendant's possession of the firearm was in furtherance of the conspiracy.

<u>SENTENCING PROVISIONS</u>

13.     The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

14.     The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

15.     The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offenses

set forth in paragraph 5. The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

16.     The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

### Sentencing Guidelines Calculations

17.     The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

### Relevant Conduct

18.     The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant

conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offenses to which the defendant is pleading guilty.

19.     The parties agree to recommend to the sentencing court that the relevant conduct attributable to the defendant is at least 1,000 kilograms but less than 3,000 kilograms of a mixture and substance containing marijuana, a Schedule I controlled substance.

## Base Offense Level

20.     The parties agree to recommend to the sentencing court that the applicable base offense level for the offenses charged in the Information is 30 under Sentencing Guidelines Manual § 2D1.1(c)(5.).

## Acceptance of Responsibility

21.     The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

## Sentencing Recommendations

22.     Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the

18

offenses as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

23.     Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

24.     The government agrees to recommend a sentence that is no higher than ten years imprisonment.

### Court's Determinations at Sentencing

25.     The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 7 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

26.     The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

### FINANCIAL MATTERS

27.     The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full

19

upon entry of the judgment of conviction. The defendant further understands that any payment schedule imposed by the sentencing court shall be the minimum the defendant is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule. The defendant agrees not to request any delay or stay in payment of any and all financial obligations. If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the court specifically directs participation or imposes a schedule of payments.

28.　　The defendant agrees to provide to the Financial Litigation Unit (FLU) of the United States Attorney's Office, at least 30 days before sentencing, and also upon request of the FLU during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLU and any documentation required by the form.

**Special Assessment**

29.　　The defendant agrees to pay the special assessment in the amount of $200 prior to or at the time of sentencing.

**DEFENDANT'S WAIVER OF RIGHTS**

30.　　In entering this agreement, the defendant acknowledges and understands that he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

a.　　If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in

20

order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

b. If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

c. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

d. At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

e. At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

31. The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offenses to which the defendant intends to

21

plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

32.     The defendant acknowledges and understands that he will be adjudicated guilty of the offenses to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

33.     The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

<u>Further Civil or Administrative Action</u>

34.     The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

## GENERAL MATTERS

35.    The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

36.    The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

37.    The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

38.    The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offenses on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

39.    The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the

23

defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing.

## VOLUNTARINESS OF DEFENDANT'S PLEA

40. The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 1-28-22

_____
JULIAN SÁNCHEZ
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 1/30/22

_____
DENNIS P. COFFEY
Attorney for Defendant

For the United States of America:

Date: 1/31/22

_____
RICHARD G. FROHLING
Acting United States Attorney

Date: 1/31/22

_____
GAIL J. HOFFMAN
ELIZABETH M. MONFILS
Assistant United States Attorneys

25